And we will hear next, Culver v. Qwest Communications. Good morning, Your Honors. Philip Schuster. Mr. Schuster, just stand by for a moment, please. Thank you. You may proceed. My colleagues from Qwest, may it please the Court, Philip Schuster, I represent Mr. Culver, plaintiff. On de novo review, the issue is whether plaintiff has presented facts, genuine materials, issues of fact, on the prima facie case of age discrimination and on the case of pretext, whether he has presented specific and substantial evidence or direct evidence of pretext. On the issue of prima facie case, this, the events surrounding Mr. Culver's work activities on June 27, 2003, are the focus of our inquiry. What is specifically interesting, initially, is that Ms. Galey, the decision maker, testified at least two or three times, and you can find this in the excerpt of record at page 135 and 164, that the triggering event, which led to Mr. Culver's termination, was an out-of-route, coffee-break-time, fraudulent timekeeping event, which occurred in July of 2003, which she testified under oath could be documented by company records. This event never took place. There is no documentation substantiating this allegation. Secondly, on the events in question on June 27, Mr. Culver was never out of route. He was instructed by his in-charge, Mr. Meisner, to proceed to Seaside to remove half-caps. The counsel, let's suppose that Ms. Galey is completely wrong on this. Let's suppose that Mr. Culver is not out of route. Now, those things would go to sort of the justification for firing him, but what does it have to do with age? Well How do you connect that to age discrimination? All right. Mr. Culver, first of all, was referred to as old man. Referred to by Ms. Galey as an old man? No. By Mr. Ingram, who was one of the decision-makers who signed the termination decision of August 1, 2000. Who made the termination decision? Mr. Ingram and Ms. Galey. Ms. Galey said that it was she who made the decision. She said, I believe she just said, I did, when asked who fired him. She said, I did. Well, if we assume, for the sake of argument, that Ms. Galey made the decision, which we don't concede, she was the cat's paw for Mr. Ingram's ageist discriminatory And what's your evidence for that? Our evidence for that is that he participated in the decision-making process leading to the termination. That's not evidence that she's the cat's paw. Well, he referred to Mr. Culver numerous times in front of his younger crew members that he was the old man, old man of the crew. And how old was Culver? What, 48? 47. 47? Mm-hmm. Okay. And Ingram was how old, 49? He was older than, Mr. Ingram was older than Mr. Culver, right? Yes. And Ms. Galey was older than Mr. Culver. But Mr. Culver's crew members were younger. Were younger. If somebody has to be older, somebody has to be younger here. Correct. And it was not inaccurate to refer to him as the old man of the crew. It's all relative, wasn't it? Well, we don't concede that. Counsel, let me interrupt for a second. On old man, I can't find a reference to old man. I see a reference to being called slow, and he also was called old school. But where does it say old? What's the evidence that he was old man? He was called old man of the crew and old man, and I believe I make those references in my brief. It's page 115 of his deposition. I believe that's correct. But that reference happened at least a year before the termination, right? Yes, but I think we have to keep in mind that the court is not to weigh the temporal relationship of the remarks to the termination. Well, at some point, there's either an inference or no inference. It's just a matter of reasonableness. If something happened the day before, then it lends credence to the possibility of a connection. If it happens 14 years before, there's no reasonable connection. And someplace in there, there's a dissipation as a matter of law that there's no reasonable inference that can be drawn. Where is that line in your opinion? Well, I think the line is with respect to whether or not Mr. Culver has shown that there was a pretext created here, and clearly he has because of the shifting reasons and because of the ill-informed decision that Mrs. Galey made, getting back to Mrs. Galey. If we assume she was the only decision-maker, there were shifting reasons. The first reasons given were that he delayed the 9-1-1 repair and that he misused company time. After litigation was filed, the reason then became fraudulent timekeeping. And then she, Mrs. Galey, testified that the triggering event or reason for termination was an out-of-route coffee break time fraudulent timekeeping event in July of 2003. All of which doesn't make any difference unless it leads logically to an inference that the real reason was age. I mean, if they had stupid reasons or no reason at all or conflicting reasons, that does not equal any form of discrimination. It may equal something else, breach of contract, stupidity, any number of things. But other than this one-year-old reference to him as the old man of the crew, what else, if anything, suggests that age was a factor in making the decision? He was not given a bucket truck or an aerial lift, as were other younger crew members. He was not given a, I think it's a 9-56 or 9-65 kick meter, to better detect irregularities in installing or removing half-taps. He was not given certain pieces of equipment that younger crew members were given. I think that goes circumstantially. I think the comments go circumstantially also. The ageist comments can be considered as circumstantial evidence of age discrimination, if not direct evidence. And, again, the ill-informed decision to terminate him by Ms. Gailey, which I covered in my brief, she did not look at the cell phone records. She felt that Mr. Meisner's, to interview Mr. Meisner was irrelevant. But you don't have any evidence of Ms. Gailey ever referring to Mr. Culver as an old man? We have no. Do you have any evidence that Mr. Ingram ever referred to Mr. Culver as an old man in front of Ms. Gailey? No, no evidence. He did refer to Mr. Culver as old man, old man of the crew. In front of the crew. And he says the time frame for that was in the spring of 2002 to early summer of 2002, which is a year. Well, we don't know. Yeah, we don't. The time frame, the half a dozen times that he heard Mr. Ingram and Mr. Ingram admitting that he might have used these terms a year or so before, but we don't know whether the innuendos were carried forward or not. I assume that they were. We don't have any evidence of that. This is your opportunity to prove it, not to assume that it did. But we don't have any proof of that, do we? Well, what we do have is the fact that Mr. Culver was being investigated for being slow and that he was accused of delaying the 9-1-1 repair. And Mr. Matney, I believe in May or June. Nobody suggested that had anything to do with age. Well, in order to establish a case of age discrimination, after the employer establishes a legitimate reason, is to show specific and substantial evidence of pretext, which we can show either by shifting reason and by dishonest motive or an investigation which is not reasonably informed and circumstantial evidence, other circumstantial evidence, such as ageist comments. Let me ask you a question. However remote they are. About the partial answer to an earlier question, you said that your client got less equipment than some of the other younger workers that were similarly situated. Who made the decision as to who got what equipment? Mr. Ingram. But not Ms. Galey? No. Not to my knowledge. No. The record shows Mr. Ingram did. And we so I think what I will do is reserve a few minutes now, unless you have further questions. You may do so, counsel. Okay. Thank you. We'll hear from Quest. Thank you, Your Honors. David Signs, Quest. May it please the Court. With me today is David Miller from Quest and Renee Starr, my associate from Perkins Coie. I know Your Honors are prepared, and I don't know if you want to begin with questions, but if not, on the prima facie case issue, there was this issue of whether the element that was at issue, the performing satisfactorily was the right standard or element or whether it should be qualified for the job. The lower court said that it is performing satisfactorily and that Mr. Culver had not even met a prima facie case on that element because he was under a final written warning. And there was no evidence presented for Crawford to question the validity of that final written report. That final written warning, not report warning, said that Mr. Culver's job was in That is the relevant backdrop against which the performing satisfactorily must be judged, not the qualified-to-job element that Mr. Culver argues. Does this matter to the outcome from your perspective if Judge Brown was wrong about what it means to make a prima facie case? Clearly, you've identified, articulated a legitimate reason, and it pops over into a pretext. Is your reliance a way of saying that you're concerned about pretext, or does the argument work just as well over there? Thank you, Your Honor. No, I'm just, I started with whether there's questions. Since there weren't, I started with, through my outline of the bases by which the Court can uphold this grand summary judgment. I'll move to pretext. That seemed to be the focus of opposing counsel's argument in a sense. It was. And let's talk about this notion that Ms. Galey testified to a July 2003 coffee incident that was the triggering event. I mean, the suggestion by opposing counsel is that Ms. Galey just created this great fabrication for why Mr. Culver was terminated, and that everybody knows there was no July 2003 coffee incident. So the suggestion is that Ms. Galey was just creating this giant fabrication, and that, therefore, shows that she was dishonest in her pretext. The support for that argument is in a partial page of the thousands of pages of deposition transcripts that were have been taken here. And it starts, and counsel didn't cite the whole testimony, and I think it's worth reading. Deposition testimony of Ms. Galey on this point starts at page, excerpt of record page 164. Was there an event that triggered Mr. Culver's termination? He was out of route at a coffee shop. Anything else? That was the incident that triggered, that finally triggered it. There were other disciplinary issues leading up to that. This out-of-route regarding coffee shop, do you recall when this occurred? Answer, sometime in July, question of 2003. Answer, correct. And then he says, counsel says, and you're sure then that the triggering event for Mr. Culver's termination is the out-of-route coffee shop, and you think of July 2003, not the 9-1-1 outage. Answer, fraudulent timekeeping. There is clearly a disconnect going on with the witness in response to this time, this line of questioning, because that fraudulent timekeeping answer just makes no sense to the question. At that point, I interject. I was at the deposition. I say, I'll object on the grounds of vagueness as to the triggering event language you used, counsel. Question, yes, I used the expression triggering event, and that's where counsel's brief cuts off the argument. If you read the rest of the transcript, which is in the record at ER 135, the exchange continues. Yes, I used the expression triggering event, and you seemed to be able to answer that. What does triggering event mean to you? Answered by Ms. Galey, what was the last event before he was terminated? What she's saying is, and if you look at her termination memo, they looked at his whole history. They didn't just willy-nilly fire him. They looked at his whole history, and the last event before he was terminated was when he was caught out-of-route at a coffee shop and suspended for a day and a half for doing that. So that's what she's saying. This coffee shop out-of-route you were questioning goes on, which makes it very clear that Ms. Galey is confused as to time, but that's it. Question goes on. This coffee shop out-of-route you're referring to in July of 2003, would there be documentation regarding that? Answer, yes. What kind of documentation were there? Answer, well, I believe in the disciplinary documentation, and I'm not sure that I think that the termination letter, it actually spells out the disciplinary items that were in, that led to the termination, and then the final coffee shop out-of-route fraudulent timekeeping event. Question, this coffee shop out-of-route, that would be discussed in the termination letter of August 1, 2003. Yes, I believe so is what Ms. Galey says. So she clearly understands that there was a prior event that was in her mind as part of the whole calculus. He had been out-of-route just in November, this happened in November of 2002, where he had been caught and suspended for doing that. There was no time fabrication. Was there any evidence in the record that other workers engaged in similar behavior but were not disciplined? No, there was no evidence. There was one, there was evidence that Mr. Ingraham, that three techs in another case where Mr. Culver had gotten caught, Mr. Culver, Mr. Mayfield, and I think Mr. Nunez, had at a prior time been caught. Nunez and Mayfield were supervised by somebody else. Culver was supervised by Ingraham. And the only evidence I recall in the record is that Ingraham got talked to by, sorry, Culver got talked to by what the supervisor of Mayfield and Nunez had done about it. That was it. So this whole idea that, and it's in their brief, and it showed up today, gosh, Ms. Galey is a liar. She's dishonest in her termination decision because she got a date wrong is just typical of what this case has been about. What about the idea that Ms. Galey, you heard counsel say Ms. Galey wouldn't even let Mike Meisner be interviewed? Mike Meisner was the in charge. He was an occupational employee at the time who was not in Astoria, sorry, was not in Seaside with Mr. Culver. He was in Astoria doing his job. And when the 9-1-1 outage occurred, he wrote a statement about his efforts to try to find Mr. Culver after the outage occurred. And that's what Ms. Galey got. She relied on that. There was another statement by Mr. McDonnell. She never refused to interview him. If you look at the deposition site in the brief that Mr. Culver asserts is the place where Galey refused to interview, it really only says that what she didn't do is confer with Mr. Meisner on the termination. She says, I refused to confer with Mr. Meisner. Why? Very simple. He's an occupational hourly worker. The last time I knew of an employer consulting with occupational workers on a termination, it just doesn't happen. And that's all she's saying. I didn't confer with the hourly worker on the termination of one of his peers. Not I didn't review or ask for an interview or anything like that. It never happened. In fact, she did have Meisner's review. Same thing on there's this assertion in the brief that Ms. Galey did not give Culver an opportunity to respond to Mr. Culver to the allegations. That's just not the evidence. The testimony cited for that proposition is this from Iabi's deposition, ER-138, where they say Ms. Iabi, who was consulted regarding Culver's termination, testified that Culver should have been given an opportunity to respond to the termination reasons. They say something similar for Ingram. I won't go through the testimony directly, but I submit that when you read the actual cited evidence, there's no suggestion that Mr. Culver was not permitted to give his side of the story. And in the record at I'll find the reference in a minute. There's the notes from June 30th, 2007 to 2003 of the investigatory meeting, where Mr. Culver was present and interviewed for about an hour and a half with his union steward present, where he gave his full side of the story. They got his story. I'd like to say a word on shifting explanations, because they just aren't present in this case. First of all, Excerpt of Record 355 is the termination memo. And in that memo, you'll see two different parts. One part says, recounts the facts relating to the 9-1-1 outage. It says, you should have stayed working on the seaside job, but you chose to return to Astoria early with no work to perform and no contact in advance with your manager. By not being at the seaside location, you delayed the 9-1-1 repair and misused company time. This 9-1-1 outage could have caused life-or-death impact. And then the last sentence is very important. In reviewing your time card that day, you showed all your time was spent at the seaside job site, eight hours regular, one hour overtime. Then the memo finishes by saying that those facts amount to a violation of the part of the code of conduct which requires that employees safeguard company assets, which includes time, against misuse of debt. The point here is that within the termination memo, all that we've talked about in this litigation, fraudulent timekeeping, misuse of company time, it's all there. It's not as if they made something up. When, three years later, they're asked what was the reason by counsel several different times over objections of asked and answered, and they say fraudulent timekeeping, they're saying one of the things that's in the memo. They're not making something up new. There's no shifting explanation here. The Lindahl case, which counsel makes much of as a shifting explanation case, is not really a shifting explanation case. It doesn't address that. And if you look at that case, it actually goes opposite to what counsel is arguing here. In Lindahl, a promotion decision was made sort of out of the blue. And a female who thought she should have gotten that promotion said to the company, why didn't I get that promotion? And six months later, the company says, well, other candidate was male, had the best overall qualifications. That was all that was said. Then in litigation, so it was a general, very general statement, contrasted with what Mr. Culver got, which was a specific termination memo looking at his whole history. In Lindahl, you get this overall general explanation. And then in litigation, the answers get a little bit more refined and more specific, and they become computer proficiency and leadership qualities is why the male got the job over the female. In addition to that, so that's the court doesn't call that shifting explanation. The court just says the original reason given pre-litigation is subjected to challenge and question, but the court also had in that case a real good reason for why it did that. And that was there was some real serious evidence of sexual stereotyping in the case. In his depositions, the decision maker in the Lindahl case had talked about the reason why the female didn't get the promotion is because females get nervous. They're emotional. And the males attack the problem right away, and there's some quotes. There's nothing like that in this case. That evidence was significant to the circuit court. It was a Ninth Circuit case in Lindahl back in 1991 that led to that decision. Finally, if you look at the stray comments, a couple of questions the court asked. Ingraham was 51. Galey was 49. Galey made the decision. Galey made the decision. There's a real one. How old was Culver? Culver was 47 at the time. I believe that's right. Maybe 46, but one of those two. Galey made the decision. There's no dispute that she talked with others in making that decision, but she made the decision, and that's what the record shows. I'll reserve the last minute. Thank you. You don't have any more time to reserve, counsel. You're just not going to use it. Oh, no. Fine. Very good. Thank you. Mr. Schuster, you have some reserve time. Mr. Culver was 15 years older than his co-workers, Your Honor, and with due respect to my colleague, we're not accusing Ms. Galey of dishonesty here. In establishing pretext, we either have to show But is that ratio of 15 years to his co-workers, is that relevant in this analysis? I think it is because when he was terminated, he was replaced, I think, by younger He was replaced by younger workers, and he was not given the same equipment that his younger workers were, and he was continually criticized for being slow with his ladder truck, which took time to set up and take down, and he was called slow. Old man. And what we are saying with due respect here is that Ms. Galey's explanation for the termination, which counsel read to you, was not reasonably informed or credible. That's all that's required. She was not informed about the events. She doesn't need to know she's the cat's paw here. Under Pollard v. Cherkoff, Mr. Ingram's words can be imputed to her. And that's the business of not talking to Mr. Meisner is important. In a summary judgment motion, you can't just have self-serving testimony standing alone. It has to be substantiated. It has to be – there has to be someone else there. Mr. Meisner testified that he saw Mr. Culver drive by the garage. This is excerpt of record 153. Drive by the garage. Mr. Culver finished his – removing the half taps at Seaside. He wasn't going to stay there and engage in a complicated task of setting up and taking down, which would have required overtime, which Mr. Ingram told him not to do. He chose to drive to Astoria to clean and restock his truck, which was part of his job. He got to Astoria, drove by the garage. Mr. Meisner and Mr. Ingram both confirmed that he had to go by the garage to establish another work site so he wouldn't be out of route. He then took a five-minute break, which was in the company investigation, which was never commented upon in counsel's brief. Ms. Gailey either chose not to read that investigation and the exculpatory evidence there. In that investigation, Mr. Culver said, I chose to leave Seaside because I had finished my job and I was going to restock my truck. Counsel, of what relevance to our analysis is the fact that this termination was upheld in arbitration and that your client did not raise any claim of discrimination in the arbitration? Well, I addressed that in the brief. And in the case law, which says that basically the courts are not to give that – are not to give that any weight, there is – if this is sent back down, the issues before the district court would be the admission of the second amended complaint and the status of a prior motion to strike the arbitration affirmative defense. Now, this motion was denied on the – this defense was denied on the merits as well as for procedural reasons. I believe the motion was, counsel – the motion was denied at that point. So it's an issue that will come up again, but I covered this in my five minutes. Very well. Thank you, counsel. Counsel, your time has expired. The case that just argued will be submitted for decision.
judges: O'scannlain, Graber, Bybee